# Richmond.

## WILLIAMSBURG POWER COMPANY, INC., v. CITY OF WILLIAMSBURG.

September 25, 1924.

1. CONTRACTS—*Parol Evidence—Declarations of Parties at time of Making Contract—Case at Bar.*—In the instant case the question at issue was the duration of a contract between a water company and a city, under which the water company was to supply the city with water, and particularly as to whether a supplemental contract had extended the time agreed upon under the original contract. There was no ambiguity in the contracts, and, therefore, the court below erred in admitting and considering parol evidence consisting of conversations between, and declarations of, the parties before and at the time of the signing of the supplemental contract, to the effect that it was the purpose to extend the time.

2. CONTRACTS—*Parol Evidence—Ambiguity—Surrounding Circumstances.*— Evidence enabling the court to read the contract in the light of surrounding circumstances, in order to more perfectly understand the intent and meaning of the parties, is properly admitted and is proper for consideration by the court, if the language employed is ambiguous or is susceptible of more than one construction.

3. CONTRACTS—*Parol Evidence—Declarations of Parties at time of Making Contract.*—The antecedent conversations and agreements between the parties, so far as they are in conflict with the written contract, cannot, of course, be received to vary or contradict it, but if its meaning be doubtful the surrounding circumstances, the condition and avowed purpose of the parties, as well as the subject matter of the contract, may be proved by parol testimony in order to enable the court to determine its meaning.

4. WATER COMPANIES AND WATERWORKS—*Contract with Municipality— Duration of Contract—Case at Bar.*—In the instant case a water company agreed to furnish a city with water "for a period of five years after the date of this contract." The date of the contract was August 30, 1916. Owing to differences between the parties a supplemental contract was executed at a later date, which contained a provision that the city did agree that the original contract should "be and become effective in · *all the terms and conditions* (italics supplied) thereof, from the first day of May, 1917."

> *Held:* That under these contracts there was no ambiguity as to the duration of the period during which the water company was obligated to furnish the city with water. The supplemental contract definitely adopts all the terms and conditions of the contract of August 30, 1916, among them the condition that the contract, unless extended, should end August 30, 1921.

Appeal from a decree of the Circuit Court of James City county and city of Williamsburg. Decree for complainant. Defendant appeals.

*Reversed.*

The opinion states the case.

*Parrish, Butcher, Churchman & Coulbourn*, and *Frank Armistead*, for the appellant.

*Ashton Dovell*, for the appellee.

CHICHESTER, J., delivered the opinion of the court.

In August, 1916, the Peninsular Bank of Williamsburg owned property in the city of Williamsburg known as the knitting mills property, which included artesian wells and water tanks suitable for furnishing the city water supply. There was a contract between the bank and the knitting mills company by which the knitting mills company acquired certain rights to operate the mills as well as an option to purchase the property.

On August 30, 1916, the Williamsburg Knitting Mills Company, the Peninsular Bank and the city of Williamsburg entered into a written contract, dated August 30, 1916, whereby the knitting mills company agreed to supply water to the city for domestic and fire purposes for a period of five years from the date of the contract.

The city agreed to accept and pay for this water at the rate of fifteen cents per thousand gallons, and for a minimum supply of 50,000 gallons per day.

The city of Williamsburg was not ready, with its water mains, to have the water delivered at the time of the signing of the contract, nor indeed for some months thereafter. It was not before January 1, 1917, that the water was turned into the city mains.

In April, 1917, the Williamsburg Power Company, Inc., purchased the knitting mills property from Sigmund Morris, trustee, to whom it had theretofore been conveyed by the bank and knitting mills company. Assignments of the water contract were made in each instance to the purchasers. The new owner at once presented the city of Williamsburg with a bill for 50,000 gallons of water a day, at fifteen cents per thousand gallons, from January 1, 1917. A dispute immediately arose between the parties, the subjects of which are hereinafter set out. Shortly thereafter there was a meeting between representatives of the city council of Williamsburg and of the Williamsburg Power Company at which all their differences were merged in a supplemental written contract. This contract bears date May 15, 1917, and after reciting that the differences between the parties had been composed, continues in part, as follows:

"Now, therefore, this agreement witnesseth, that for and in consideration of the premises and the respective undertakings of the parties hereto, it is covenanted and agreed that the city of Williamsburg will pay, and the Williamsburg Power Company will accept, the sum of three hundred and fifty-eight and 35/100 dollars ($358.35) in full payment of all amounts due to the 1st day of May, 1917, from the city of Williamsburg, to the Williamsburg Power Company, as the successor of the

Williamsburg Knitting Mills, Incorporated, in the aforesaid contract of August 30, 1916, and that the city of Williamsburg does hereby agree that said contract of August 30th shall be and become effective in all of the terms and conditions thereof from the 1st day of May, 1917, and does hereby give to the Williamsburg Power Company notice that said contract shall be in effect from said date, and does hereby accept the Williamsburg Power Company as the successor of the Williamsburg Knitting Mills, Incorporated, in said contract."

The original contract of August 30, 1916, contained a provision giving the city of Williamsburg the right, before the expiration of the contract, to have it extended or renewed for an additional period of five years. In August, 1921, the Williamsburg Power Company notified the city that the water contract would expire at the end of the month. The city contended that the contract did not expire until April 30, 1922. That the memorandum of agreement of May 15, above, extended the time of the running of the original contract to five years from May 1, 1917. The water power company cut off the water, but turned it on again under protest.

On March 11, 1922, the city gave the water power company notice that it would avail itself of the option and renew the contract for five years from May 1, 1922, and the water power company, refusing to recognize the claim of the city, a bill was filed by the city praying for specific performance and for an injunction enjoining the cutting off of the water supply.

The only controversy before the trial court and before this court is involved in the construction of that part of the supplemental contract above quoted. Was it the intention of the parties, after settling all their differences, to treat contractual relations as actually starting on May 1, 1917, and continuing for a period of five

years from that date? It is contended on behalf of the water power company that the contract expired on August 30, 1921, that the city was too late in giving notice that it wanted to take advantage of its option to renew the contract for an additional five years. On the other hand the city of Williamsburg contends that the supplemental agreement fixed the starting point of the contract as May 1, 1917, and that the notice given on March 11, 1922, that the option be exercised by the city and the contract renewed, was in time. The trial court decided in favor of the contention of the city of Williamsburg.

The final decree in which the conclusions of the trial court are embodied is as follows:

"This cause came on this day to be again heard in vacation, by and with the consent of both parties here entered of record, upon the papers formerly read together with the depositions filed on behalf of the plaintiff on December 6, 1921, and February 23, 1922, and upon the depositions of the defendant filed herein on February 11, 1922, and to the several objections of the defendant made and noted during the taking of the depositions on behalf of the plaintiff, which said objections are so set out and noted in said depositions and was argued by counsel.

"Upon consideration whereof, the court having fully considered all of the objections made in the depositions on behalf of the defendant, doth overrule the same, to which action of the court the defendant, by counsel, excepted. And the court having maturely considered the pleadings and all of the evidence and exhibits filed by both plaintiff and defendant, and being of the opinion that the supplemental contract bearing date May 15, 1917, and a copy of which is filed as exhibit 'B' with complainant's bill, and providing that the agreement of

August 30, 1916, a copy of which agreement is filed with complainant's bill marked exhibit 'A,' shall be and become effective in all of the terms thereof on May 1, 1917, included the period during which the service is to be rendered, and that the period commences from the 1st day of May, 1917, and not from August 30, 1916.

"And it further appearing to the court that the agreement between the parties, a copy of which has been referred to as exhibit 'A,' provides for a renewal upon the expiration thereof, and it being admitted by counsel for the defendant that the city of Williamsburg gave notice to the Williamsburg Power Company, on the 11th day of March, 1922, of its election to renew the said contract.

"Now, therefore, it is ordered, adjudged and decreed that the Williamsburg Power Company, a corporation, its officers, agents and employees, be and they hereby are, enjoined from cutting off the water supply provided for under the said agreement, for domestic, fire and general purposes and from in any manner discontinuing the supply of the said water as heretofore furnished during the life of the said renewal contract, to-wit: For five years from and after the 1st day of May, 1922.

"It is adjudged and ordered that the plaintiff recover of the defendant its costs in this behalf expended and the objects of this suit having been fully accomplished, it is ordered that the same be dismissed from the dockets and the papers filed among the decided causes.

"Whereupon the defendant excepted to the opinion of the court and indicated its intention to apply to the Supreme Court of Virginia for an appeal."

There are three assignments of error, as follows:

"I. The admission of parol evidence in an attempt to show an extension of the contract, which varied and altered the written contract.

"II.  Construing the memorandum agreement of May 15, 1917, as extending the time of performance of the contract of August 30, 1916, from five years after August 30, 1916, to five years after May 1, 1917.

"III.  The finding of the court that notice given by the city to the power company on March 11, 1922, of its election to extend the contract for five years, was sufficient to bind the company."

These assignments of error can conveniently be considered together because they all involve either the methods or means employed by the trial court in construing the contracts under consideration or the results arrived at by the court.

[1-3] The admission and consideration by the court of parol evidence which tended to show that it was the intention of the parties to the supplemental contract to start the five year period within which water was to be supplied by the Williamsburg Power Company to the city of Williamsburg on May 1, 1917, instead of on August 30, 1916, and that it was to end on April 30, 1922, instead of on August 29, 1921, and which consisted of conversations between, and declarations of, the parties before and at the time of the signing of this contract, to the effect that it was the purpose to extend the time, was clearly erroneous.  That evidence which would enable the court to read the contract in the light of surrounding circumstances, in order to more perfectly understand the intent and meaning of the parties was properly admitted and was proper for consideration by the court, if the language employed is ambiguous or is susceptible of more than one construction.

The rule is well stated in Greenleaf on Evidence (15th ed.) vol. 1, section 275:

"When parties have deliberately put their engagements into writing, in such terms as import a legal obli-

gation, without any uncertainty as to the object or extent of such engagement, it is conclusively presumed that the whole engagement of the parties, and the extent and manner of their undertaking, was reduced to writing; and all oral testimony of a previous colloquium between the parties, or of conversation or declarations at the time when it was completed, or afterwards, as it would tend in many instances to substitute a new and different contract for the one which was really agreed upon, to the prejudice, possibly, of one of the parties, is rejected. In other words, as the rule is now more briefly expressed, 'parol contemporaneous evidence is inadmissible to contradict or vary the terms of a valid written instrument.' "

Section 277, *idem:*

"It is to be observed, that the rule is directed only against the admission of any other evidence of the language employed by the parties in making the contract, than that which is furnished by the writing itself. The writing, it is true, may be read by the light of surrounding circumstances, in order more perfectly to understand the intent and meaning of the parties; but, as they have constituted the writing to be the only outward and visible expression of their meaning, no other words are to be added to it, or substituted in its stead. The duty of the court in such cases is to ascertain, not what the parties may have secretly intended, as contradistinguished from what their words express, but what is the meaning of words they have used."

To the same effect is Wigmore on Evidence, volume 4, section 2471.

And again in Elliott on Contracts, section 1517, it is said:

"Where the language is ambiguous and susceptible of more than one construction, the court should attempt to

place itself as near as possible in the situation of the parties to the contract at the time the agreement was entered into, so that it may view the circumstances as viewed by the parties and thus be enabled to understand the language used in the sense with which the parties used it.   In order to accomplish this object it is generally proper for the court to take notice of surrounding and attendant circumstances and construe the language used in the light of such circumstances."

The Virginia authorities, upholding these universal rules, are so numerous and well known that it would be an unnecessary prolongation of this opinion to quote extensively from them here.   They are summarized appropriately for the purposes of this case by Judge Prentis in *McCorkle & Son* v. *Kincaid,* 121 Va. 546, 93 S. E. 642, as follows:

"The antecedent conversations and agreements between the parties, so far as they are in conflict with the written contract, cannot, of course, be received to vary or contradict it, if its meaning be doubtful the surrounding circumstances, the condition and avowed purpose of the parties, as well as the subject matter of the contract, may be proved by parol testimony in order to enable the court to determine its meaning."

In *Richmond Eng. Corp.* v. *Loth,* 135 Va. 110, 115 S. E. 774, Sims, P., speaking for the court, said (quoting from the syllabus):

"If the parties have made a memorial of their bargain * * * * their actual intent, unless expressed in some way in the writing, is ineffective * * *.  In contracts of which no memorial is made, * * * * it is doubtless true that where parties have made a bargain which both of them understand in a certain sense, their intent (which at least has been made plain to one another) must be sought, however inadequately it may

have been expressed. But in written contracts this is not true, and the intention of the parties can be found only in the expression of the parties in the writing. * * * In the interpretation of written contracts it is not the real intent, but the intent expressed or apparent in the writing, which is sought. * * * It is true that the court will always put itself in the place of the contracting parties, and although the contract is in writing, will read it in the light of all the circumstances surrounding the parties when the contract was made, and, further, where the writing only partly expresses the intention in question and is ambiguous because of careless or inapt expressions, the court may consider the actual intention in aid of the interpretation of the writing; still, in such case, it is not merely the intention of one of the parties which is to be considered, but the intention also of the other party, or parties, to the contract as found substantially expressed in the writing itself, when the court reads the whole of it in the light of all of the aids to interpretation mentioned."

And in *Heatherly* v. *Farmers' Bank*, 51 W. Va. 70, 5 S. E. 754, the court said:

"If a written contract is on its face ambiguous, the surrounding circumstances, the situation of the parties, and the subject matter of the contract, and acts done by the parties under it, may be considered as aid in giving it construction, but not the verbal declarations of the parties."

[4] Discarding, therefore, the antecedent conversations and verbal declarations complained of, and viewing the contracts of August 30, 1916, and May 15, 1917, as they are written, and if need be in the light of surrounding circumstances, the conclusion seems inevitable that the trial court erred in its construction thereof.

First, let us look at the language employed by the

contracting parties, and see if we can gather their intention and meaning therefrom. And then let us look at the contracts in the light of the surrounding circumstances, the situation of the parties, and the objects to be attained.

The contracts of August 30, 1916, declares "the company agrees to furnish and supply the city with water for domestic, fire and general purposes for a period of five years after the date of this contract." There is no possible ambiguity here. The contracting parties mean that the obligation to furnish and supply the city with water would cease (unless the contract was renewed for another five year period under the option provided for and referred to above) at midnight on August 29, 1921. In the interpretation of the parties intentions, therefore, we can treat the contract as stating that the company agrees to supply the city with water until August 30, 1921. This was a definite term and condition of the contract. It was also the definite fixed time for the termination of the contract independently of whether the company actually began to pump water into the city mains on August 30, 1916, or not. Five years after the date of this contract can mean nothing more nor less than the five year period beginning August 30, 1916, and ending August 29 (inclusive), 1921. There is nothing in this contract which even hints that the five year period shall begin to run from the time the water pipes are laid in the city or from any other time than August 30, 1916. Contractual relations were to exist under this contract for a period of five years from its date and no longer, with the exception heretofore noted if the city availed itself of its option to extend the time.

Then comes the supplemental contract of May 15, 1917. It indicates that there had been some disputes, some differences, between the parties, and the supple-

mental contract is not only plain on its face as to what they were, but it settles them, and then it declares "the city of Williamsburg does hereby agree that the said contract of August 30, 1916, shall be and become effective in *all the terms and conditions* (italics ours) thereof, from the first day of May, 1917."

One of the terms and conditions of the contract of August 30, 1916, was that the company agreed to furnish the city with water for a period of five years *from* and *after* the date of the contract, which meant, as we have said heretofore, during the five year period from August 30, 1916, to August 30, 1921; or to state it in another way, to furnish water to August 30, 1921. There is no ambiguity here. And there is no partial expression of intention as referred to by Judge Sims in *Richmond Eng. Corp.* v. *Loth, supra.* The supplemental contract definitely adopts all the terms and conditions of the contract of August 30, 1916, among them the conditions that the contract, unless extended, shall end August 30, 1921. The expression "become effective" does not throw any doubt upon the meaning of the parties as to the time of the termination of the contract, because the supplemental contract itself shows there had been disputes between the parties; that the contract had not theretofore been entirely in effect, and that these disputes had been composed. It indicates exactly what those differences had been, viz., as to whether a binding contract existed; the amount due under it if one did exist, and recognition of the power company as a party to it. But there is no indication that there was any dispute as to the date of the termination of the original contract. On the contrary not only did that contract have a definite date for termination, to-wit, five years from August 30, 1916, but the supplemental contract, after recognizing the existence of the original contract, declared that this term and condi-

tion, along with all its other terms and conditions, should be and become effective from the first day of May, 1917.

In other words, not only did the original contract have a definite date of termination, but the supplemental contract recognized the continued existence of the old contract in *all* its terms. It would seem to follow that the date of termination must remain the same, especially since no other provision is made in respect to the time the contract was to run.

Nor does the date May 1, 1917, selected as the date when the old contract should be and become effective, render the contract on this point ambiguous, because it was the old contract, the contract of August 30, 1916, which was to be and become effective, in *all* its terms and conditions. In addition it was the natural thing to designate the first of some month when the contract should become effective. The original contract provided for payments by the month, and upon readings of the water meter taken on the first day of each month. As the supplemental contract shows that all monetary differences has been settled by compromise between the parties up to May first, this was the logical time to start living strictly up to the terms and conditions of the original contract, that is, to pay for water at fifteen cents per thousand gallons, and a minimum supply per day of 50,000 gallons, from that date and on to the end of the contract as fixed by the terms and conditions of the contract of August 30, 1916.

In view of the foregoing it does not seem necessary to call to the aid of the court the circumstances and conditions surrounding the parties before and at the time of the execution of the contracts, in order to reach a conclusion as to the intention of the parties. If, however, this is resorted to, it but confirms the conclusions reached without such aid. Outside of the parol testi-

mony as to declarations of intention by some of the
parties interested in the contracts, which as said should
have been excluded from consideration, and admitting
the correspondence of attorneys representing the parties
and the minutes of the town council, there were four
matters of controversy or matters in dispute which
make clear the situation of the parties, indicate the
reason for the execution of a supplemental contract,
and throw light on what that contract would naturally
contain to settle those matters in dispute.

First, whether the original contract had ever been
executed by the parties. This contention was disposed
of by production of the contract itself duly executed
by the parties and its recognition in the contract of
May 15, 1917. Second, whether the minimum supply
clause of 50,000 gallons of water per day was in effect,
and, therefore, whether the city owed the power com-
pany for at least this amount of water per day from
January 1st, when the water was turned into the city
mains. This contention was compromised by the pay-
ment of $358.35 as set out in the supplemental contract.
Third, there was some dispute as to recognition of the
Williamsburg Power Company, Inc., as successor of
the Williamsburg Knitting Mill Company. And the
supplemental contract disposed of this by a recognition
of the power company as a party to the contract as
successor to the knitting mill company. Fourth, there
was some evidence that the city of Williamsburg was
not ready with its water mains on August 30, 1916, to
receive the water which it had contracted for. But
this fact was known to the parties at the date of the
signing of the original contract and in spite of this
knowledge the termination of the contract was fixed at
five years from the date (August 30, 1916) of that con-
tract. And the evidence shows that the water was

turned into the city mains as soon as they were completed, on January 1, 1917. So there is nothing in the situation of the parties, or the conditions surrounding them, or the objects to be attained to justify the court in holding that these contracting parties meant anything other than they actually said and did when the controversies which arose between them, brought them together on May 15, 1917.

They said nothing in the contract then executed as to a change in the time of the running of the original contract in all its terms and conditions, one of which was the time it was to continue in existence. On the contrary they met on May 15, 1917, and settled all their differences, as far as any proper evidence shows differences to have existed, and they settled them by written memorandum signed by the parties, which, when read along with the contract of August 30, 1916, and which, when read in the light of the conditions which surrounded the parties, admits of no doubt of their intentions.

From the foregoing it is apparent that the court below erred in construing the supplemental contract of May 15, 1917, as extending the time of performance of the contract of August 30, 1916, from five years after August 30, 1916, to five years after May 1, 1917, and in finding that notice given by the city to the power company on March 11, 1922, of its election to extend the contract for five additional years, was in time, and sufficient to bind the company.

The decree of the Circuit Court of Williamsburg and James City county will, therefore, be reversed and this court will enter such decree as said court should have entered, in conformity with the foregoing opinion.

*Reversed.*